UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

KATHY G. LEMERANDE,

        Plaintiff,

  v.                                     Case No. 17-C-190

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

        Defendant.

## DECISION AND ORDER

This is an action for judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Kathy G. Lemerande's applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act. For the reasons set forth below, the Commissioner's decision will be affirmed.

## BACKGROUND

On May 14, 2012, Kathy Lemerande, then age 45, filed an application for DIB and SSI with an alleged onset date of June 22, 2004 due to depression, hypothyroidism, high blood pressure, gastroesophageal reflux disease (GERD), arthritis, flat feet, graves disease, and migraines. R. 85, 189. The Social Security Administration (SSA) denied the application initially on September 25, 2012. R. 129. After her application and request for reconsideration were denied, Lemerande requested an administrative hearing. ALJ Brian Lucas held a hearing on August 5, 2015. Both Lemerande and a vocational expert testified. R. 32–82.

At the time of the hearing, Lemerande was 5'2" and weighed 238 pounds. R. 66. Lemerande testified that she completed high school in 1984. She worked in food service as an employee of Burger King. R. 47. After obtaining a CNA certificate in 2002, Lemerande provided in-home health care. R. 38–39. She then worked a full-time seasonal position as a cashier for a restaurant in Wisconsin Dells. R. 44–45. In April 2011, Lemerande worked at a McDonalds for three days but had to quit because of the pain in her feet. At the time of the hearing, Lemerande worked "very part-time" for a company called IRIS providing in-home, supportive care for two autistic children. R. 42–43.

Lemerande testified that the physical problems that prevented her from working included her knees, her left ankle, the second toe on her left foot, her shoulders, her left hip, her hands, and migraines. She testified that her knees were the primary physical problem. She testified she has a torn meniscus and is unable to kneel or even take a bath. She stated she has difficulty going up or down stairs, can stand for about ten to fifteen minutes if she keeps changing positions and can sit for about ten minutes before her legs are "sore and achy" and she has to move them around. R. 52–53. Once her knees hurt, Lemarande testified that "everything hurts, my feet, my hips, my back, lower back." R. 53. She testified the pain in her knees was constant at a level of 9 out of 10 with the left worse than the right. *Id.* At night she would wake up from pain, and it would take from two to three minutes for her to straighten out her legs. Elevating her legs and constantly changing positions gave some relief. She testified she had previously had some injections and was taking over-the-counter medications such as Aleve. R. 54–55.

Lemerande also testified that the pain in her left ankle was constant, a level 10, and made walking very difficult. She could walk fifteen minutes but would then be done and unable to move

2

anymore. R 56–57. She testified to constant pain in the second toe on her left foot which she described as deformed and arthritic. R. 56. She also testified to level 8 pain in her shoulders that would come on sometimes without any activity precipitating it and that could only be alleviated by holding her arms above her head. R. 57. Arthritis in her hip caused constant level 8 pain, and in her hands level 10. Lemerande testified that "everything is so connected that there are days that my whole body aches. I can hardly move." R. 58–59. She also testified to severe migraines two to three times a month that would last a day. R. 60.

With respect to mental impairments, Lemerande testified that she thought she had depression because she liked to be alone in her room, felt like there was a black cloud over her, and experienced a dull feeling that made it difficult for her to get through the day. R. 61. She testified she took Buspirone for depression and Lorazepam for panic attacks as needed, as well as Wellbutrin. R. 61–62. She testified she experienced panic attacks or anxiety two or three times a week and did not like being around crowds or other people. R. 64.

In a decision dated October 7, 2015, the ALJ found Lemerande was not disabled. R. 15. The ALJ concluded Lemerande met the insured status requirements since June 30, 2016 and has not engaged in substantial gainful activity since June 22, 2004, the alleged onset date. R. 17. The ALJ found Lemerande had the following severe impairments: dysfunction of major joints, obesity, and osteoarthrits. R. 18. He determined Lemerande's hyperlipidemia, hypertension, gastric esophageal reflux disease (GERD), thyroid disorder, diabetes, migraine, depression, and anxiety were nonsevere because they do not cause more than minimal limitation in her ability to perform basic mental work activities. R. 19. At step three, the ALJ determined Lemerande's impairments did not meet or medically equal any listed impairments under 20 C.F.R. § 404, Subpart P, Appendix 1.

3

The ALJ ultimately determined Lemerande had the following residual functional capacity (RFC): "[T]he claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) and 416.967(a) except for the allowance for alternative sitting and standing at will with no loss of productivity, no greater than frequent use of hands, would likely be absent 1 day per month, and would likely be off task 5 percent in addition to normal breaks due to pain." R. 21. With these limitations, the ALJ found that jobs exist in significant numbers in the national economy that Lemerande can perform. R. 25. Based on these findings, the ALJ concluded Lemerande was not disabled within the meaning of the Social Security Act. The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Lemerande's request for review on December 7, 2016. R. 1. Thereafter, Lemerande commenced this action for judicial review.

## LEGAL STANDARD

The Commissioner's final decision will be upheld if the ALJ applied the correct legal standards and supported his decision with substantial evidence. 42 U.S.C. § 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence is "such relevant evidence as a reasonable mind could accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek*, 662 F.3d at 811. The ALJ must provide a "logical bridge" between the evidence and his conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v.*

4

*Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering acts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

## ANALYSIS

**A. Evaluation of Alleged Symptoms**

Lemerande asserts the ALJ failed to properly assess her subjective symptoms. The regulations set forth a two-step process for evaluating a claimant's statements about her symptoms. *See* 20 C.F.R. § 416.1529. The ALJ first determines whether a medically determinable impairment "could reasonably be expected to produce the pain or other symptoms alleged." *Id.* § 404.1529(a). If so, the ALJ then "evaluate[s] the intensity and persistence" of the claimant's symptoms and determines how they limit the claimant's "capacity of work." *Id.* § 404.1529(c)(1). In evaluating the intensity and persistence of a claimant's symptoms, the ALJ looks to "all of the available evidence, including your history, the signs and laboratory findings, and statements from you, your treating and nontreating source, or other persons about how your symptoms affect you." *Id.* The ALJ also considers medical opinions. *Id.*

Until recently, the evaluation of the intensity, persistence and limiting effects of the claimant's symptoms was viewed by the SSA as a credibility determination. *See* SSR 96-7p, rescinded and superceded by SSR 16-3p (effective March 27, 2016, and republished October 25, 2017). In adopting SSR 16-3p, the SSA eliminated the use of the term "credibility" from its sub-regulatory

policy in order to "clarify that subjective symptom evaluation is not an examination of an individual's character." 2017 WL 5180304, at *2 (Oct. 25, 2017). Under SSR 16-3p, the question the SSA asks is whether the symptoms claimed are "consistent with the objective medical and other evidence in the individual's record." *Id.* at *2. Since SSR 96-7p was in effect at the time the ALJ issued his decision in this case, it is that ruling that governs my review here. *Id.* at *1. Regardless, the result would be the same since the new ruling changed only its terminology, not its substance. Whether or not the SSA chooses to use the word "credibility," statements by the claimant concerning the intensity, persistence and limiting effects of his or her impairments that are inconsistent with the medical and other evidence in the record need not be accepted by the ALJ in reaching a decision.

In any event, a court's review of a credibility, or consistency, determination is "extremely deferential." *Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013). On judicial review, reviewing courts "merely examine whether the ALJ's determination was reasoned and supported." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (citing *Jens v. Barnhart*, 347 F.3d 209, 213–14 (7th Cir. 2003)). The court is not to reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for that of the Commissioner. *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). "It is only when the ALJ's determination lacks any explanation or support that we will declare it to be patently wrong . . . and deserving of reversal." *Elder*, 529 F.3d at 413–14 (internal quotation marks and citations omitted).

In this case, the ALJ noted Lemerande's osteoarthritis and joint disease in her lower extremities, her arm pain, and her general pain could reasonably be expected to cause her alleged symptoms, but Lemerande's "statements concerning the intensity, persistence and limiting effects of

these symptoms are not entirely credible." R. 22, 24. Lemerande challenges the ALJ's determination on several grounds.

Lemerande argues that the ALJ erred in giving partial credit to her allegations but then failing to describe which statements are credible. Yet, an ALJ is not required to "specify which statements were not credible." *Shideler v. Astrue*, 688 F.3d 306, 312 (7th Cir. 2012); *see also Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992) (noting that an ALJ need only "minimally articulate reasons for crediting or rejecting evidence of disability"). An ALJ is not a polygraph machine that assesses each statement individually. That kind of detail is neither required nor necessary for judicial review. Implicit in the ALJ's finding that Lemerande could perform work at the sedentary level was his further finding that she was not as debilitated as she claimed. The crucial question is whether he provided reasons based on the record before him to support this conclusion.

Lemerande also argues that the ALJ erred in relying on the outdated function report she completed in 2012 and failed to discuss her most recent function report. Lemerande completed two adult function reports one on July 2, 2012 and the other on April 11, 2013. R. 243–52; 266–74. The ALJ expressly cited the July 2, 2012 report in describing Lemerande's claimed functional limitations. R. 22. Because he failed to cite to the later report, Lemerande contends that the ALJ failed to build an accurate and logical bridge from the evidence to his conclusions. ECF No. 20 at 17.

The ALJ did not err in not explicitly mentioning the April 2013 report. An ALJ is not required to discuss every piece of evidence in the record, especially where much of the evidence is cumulative. *Simila v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2009). The ALJ described the limitations Lemerande attributed to her various impairments both in the Function Reports she submitted in

7

support of her claim and in her testimony at the hearing. He specifically noted that Lemerande claimed she could stand only 15 to 20 minutes, walk only 10 minutes without pain, and could not kneel. Citing her July 2, 2012 Function Report, the ALJ noted she said she could sit for only 30 minutes and stand for 20 minutes total for the entire workday. R. 22 (citing R. 252). Actually, the ALJ erred. Lemerande stated in the 2012 report that she could only sit for 20 minutes total in a day as well as stand a total of 20 minutes. R. 252. Leaving aside the fact that if Lemerande was truly unable to stand and sit for more than a total of 40 or 50 minutes in a day, this would mean that she would be lying down more than 23 hours a day, Lemerande fails to point to any greater limitation she claimed in her April 11, 2013 Report. Moreover, the ALJ found that even the limitations claimed in the earlier report were inconsistent with the medical and other evidence in the record. If, as her argument assumes, the limitations she claimed in her later report were even more severe, it is difficult to see how she was harmed. Had the ALJ focused on the later report, he likely would have found even more reasons to question the credibility of her statements. At least Lemerande offers no reason to conclude otherwise.

Lemerande next argues that the ALJ erred in relying on the lack of objective medical evidence as a reason for discounting her claim of severe and chronic pain. ECF No. 17 at 20. She claims that the ALJ's reliance on the absence of medical evidence violates SSR 16-3p.

This argument rests on a partial reading of SSR 16-3p. It is true that once it is determined that an impairment could cause the symptoms claimed, an ALJ cannot "disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual." SSR 16-3p, 2016 WL 1119029, at *5. The Ruling goes on to state, however,

that "objective medical evidence is a useful indicator to help make reasonable conclusions about the intensity and persistence of symptoms, including the effects those symptoms may have on the ability to perform work-related activities . . . ." *Id.*; *see also Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005) ("[A] discrepancy between the degree of pain claimed by the applicant and that suggested by medical records is probative of exaggeration."). Moreover, in discussing the medical reports, the ALJ noted not only the objective medical findings but also the notations indicating her own statements regarding the history of her impairments, the symptoms she experience, her responses to treatment, and her daily activities. This is entirely consistent with SSR 16-3p. 2017 WL 5180304, at *6– 7.

Here, the ALJ determined Lemerande's pain and the limitations related to her condition were not substantiated by the objective medical evidence as well as other evidence in the record including the information provided by Lemerande's treating physicians, Lemerande's own statements to physicians, and her activities of daily living. The ALJ explained, for example, that though the medical records demonstrate a long history of osteoarthritic complaints, particularly in Lemerande's knees and feet, her complaints only became persistent in 2010, six years after her alleged onset date. R. 22. The ALJ noted that "early 2009 notes showed the claimant to be in good physical condition with no significant physical complaints and good range of motion throughout on exam." *Id.* In July 2010, however, Lemerande reported difficulty working on her feet all day due to left foot, knee, and heel pain. A September 2010 x-ray revealed mild degenerative joint disease, and findings on physical examination showed that, although her gait was antalgic, she had normal range of motion and no indication of meniscal or ACL tear. The ALJ observed that Lemerande reported improvement after a few visits with a physical therapist. R. 22.

9

The ALJ acknowledged that, in April 2011, Lemerande complained of bilateral fasciitis pain and occasional lower extremity swelling which caused difficulty standing at work. Dr. Michal Slovick observed she wore Crocs brand shoes and recommended she get a pair of shoes that provide better support. R. 22 (citing R. 412). The ALJ noted her physical exam showed poor posture, pitting edema bilaterally in her legs, and plantar fascia tenderness in the right foot for which she was prescribed TED hose. She was instructed to perform plantar fasciitis exercises and follow up with a podiatrist. *Id.* April 21, 2011 x-rays showed no signs of fracture, stress fracture, or cortical erosions but revealed a moderate bunion deformity. Dr. David Miller recommended orthotics and gave her a work note to allow for periodic sitting for eight weeks. *Id.* (citing R. 415). The ALJ explained Lemerande received orthotics in May 2011 and was again instructed to stop wearing Crocs because they provide little support. By September 2011, Lemerande reported that the inserts provided improvement for her foot pain and posture. *Id.*

The ALJ observed that on October 31, 2011, after an MRI revealed Lemerande had a meniscal tear in her knee, she presented to an examination with Dr. David Romond, an orthopedic surgeon, on referral from Dr. Cindy Catania. Dr. Romond's evaluation showed Lemerande had a trace limp, difficulty squatting and rising, and tenderness to her bilateral knees. He performed a steroid injection to the knee to determine whether the pain was caused by degenerative change or internal derangement. R. 23 (citing R. 428). The ALJ acknowledged the injection only helped for a brief time. Dr. Romond prescribed nonsteroidal anti-inflammatory drugs (NSAIDs) and encouraged her to return to the YMCA for recumbent bike and pool exercise. R. 433. Although Lemerande did not take the NSAIDs due to concerns with her blood pressure, she exercised twice weekly without them. The ALJ observed Lemerande did not return to Dr. Romond until May 2012,

10

which he believed showed improvement or stabilization of her knee pain. Lemerande returned to physical therapy in June and October 2012 for knee and IT band therapy. R. 23.

The ALJ noted that, in 2013, Lemerande complained her knee and foot pain began to interfere with her walking exercises. Although injections offered some relief, the relief was generally short in duration. X-rays revealed degenerative changes in her left foot and the previously noted deformity. Her podiatrist prescribed new orthotics and encouraged her to continue walking for exercise. The ALJ observed that although Lemerande complained of toe pain in 2014, she reported she continued to walk three miles per day. R. 741. X-rays revealed degenerative changes around the toe joint, but the toe otherwise appeared normal upon examination. She received a brace and was advised to return if her pain persisted. Lemerande later indicated the brace had been helpful. R. 750.

In September 2014, Lemerande's knee pain became more problematic. An MRI of the left knee revealed meniscal tear, tricompartmental osteoarthritis, and Baker's cyst. The ALJ also noted Lemerande developed bilateral hand and left shoulder pain. X-rays of the shoulder revealed mild AC joint changes, but hand x-rays showed no abnormalities. She received injections in the upper extremities, which the ALJ acknowledged were beneficial, though her knee injections only lasted for a few weeks. Dr. Robert Hausserman advised that the complex tear of the medial meniscus may benefit from arthroscopy, but Lemerande was hesitant to have surgery. R. 845. Lemerande received injections in her left hip in April 2015 after x-rays revealed a slight narrowing of the hip. The ALJ noted she reported little benefit from the injections. Dr. Hausserman prescribed NSAIDs for two weeks, though Lemerande explained she did not follow her NSAIDs schedule. He advised Lemernade to stay on the medication schedule and follow up if her symptoms worsen. R. 843.

Lemerande returned to Dr. Hausserman in July 2015, less than one month before her hearing, complaining of tingling in her forearms, hands, and fingers. She was referred for EMG, which showed no clear evidence of large fiber neuropathy, motor radiculopathy, or muscle denervation in the upper extremities. R. 841.

Missing from all of the medical records is any indication that Lemerande was suffering from the severe and constant pain she described in her testimony at the hearing or that she was as limited as she claimed in her two Function Reports. It is not unreasonable to believe that if she truly was unable to remain on her feet or even sit for more than 40 minutes a day, she would have mentioned it to her doctors. It is also reasonable to believe that if she was in the constant and severe pain she described to the ALJ, her doctors would have recommended more aggressive treatment and prescribed something stronger than over-the-counter pain analgesics. Instead, she reported to Dr. Miller as recently as May 16, 2014, some ten years after her alleged onset date, that she was still walking three miles a day for exercise despite the problems with her feet. R. 741. As the ALJ noted, "This is but one of many examples of the claimant's allegations not being supported by the treatment notes and physical findings." R. 24. And although she reported worsening pain in her left knee, it was not so severe that she consented to her doctors recommendation of arthroscopy. Given the lack of medical findings of severe disability and based on the absence of consistent complaints in her medical records, the ALJ reasonably concluded that Lemerande had significantly exaggerated her symptoms and found her "not entirely credible." R. 22.

Despite the ALJ's conclusion that Lemerande was not fully credible in her statements concerning her symptoms and limiting effects of her conditions, he did not simply reject all of her statements. Instead, the ALJ gave partial credit to her allegations and formulated an RFC that

12

accommodated those limitations. R. 24. In short, the ALJ followed the regulations governing the assessment of a claimant's statements concerning her pain and other symptoms, and his conclusion is not patently wrong. Therefore, his assessment of Lemerande's credibility does not necessitate remand.

**B. RFC Assessment**

Lemerande next challenges the ALJ's RFC assessment. An RFC measures the most an individual can do despite the physical or mental limitations imposed by her impairments. SSR 96-8p, 1996 WL 374184, at *2. In forming a RFC, the ALJ must review all of the relevant evidence in the record, including any information about the claimant's symptoms and any opinions from medical sources about what she can still do despite her impairments. *Id.* The ALJ "must consider all allegations of physical and mental limitations or restrictions and make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." *Id.* at *5.

Lemerande claims the ALJ improperly gave greater weight to the state agency physicians and relied on their opinions in assessing her RFC. The main problem with Lemerande's argument, however, is that none of her treating physicians offered any opinion on whether she was capable of work or what her functional limitations actually were. While Lemerande's health care providers performed physical examinations, conducted various diagnostic tests in an effort to determine the underlying cause of her complaints, prescribed medications and suggested exercises she could perform in the hope that these treatment methods would alleviate her claimed symptoms, none of them offered any opinion as to what she could or could not do in a work setting. In the absence of any opinions by Lemerande's treating physicians and other health care providers, it was entirely reasonable for the ALJ to rely on the state agency consultants who actually offered opinions on

Lemerande's functional capacity based on their review of the record. Dr. Pat Chan opined that Lemerande could perform sedentary work, and Dr. Jack Spear and Dr. Deborah Pape concluded Lemerande's mental impairments were not severe. "State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation." 20 C.F.R. § 404.1527(e)(2)(i). It is appropriate for an ALJ to rely on the opinions of physicians and psychologists who are also experts in social security disability evaluation. *Id.*

Lemerande contends the ALJ erred in relying upon the state agency reviewing physicians' opinions because they did not review all of the medical records that were added to the record after they reached their conclusions. Dr. Pape completed her mental residual functional capacity assessment on September 21, 2012; Dr. Chan completed his physical residual functional capacity assessment on May 17, 2013; and Dr. Spear completed his assessment on May 17, 2013. These assessments were completed more than two years before the August 5, 2015 administrative hearing, and, as a result, the state agency physicians did not have the opportunity to review at least two years of medical records that were ultimately submitted to the ALJ. Nevertheless, it was not unreasonable for the ALJ to credit their opinions based on the review of the records they did undertake. Their opinions remained relevant since Lemerande alleged disability beginning June 22, 2004, eight years before the completion of the earliest assessment. The state agency physicians' opinions that Lemerande was not disabled as of May 2013 was important to the ALJ's determination that she was not disabled at least up to that date.

In addition, the ALJ did not rely entirely on the state agency reviewing physicians' opinions in forming the RFC. As to Lemerande's physical impairments, the ALJ conducted an extensive review of the medical evidence and gave partial credit to Lemerande's own statements regarding her limitations. His RFC included additional limitations that allowed for alternating sitting and standing at will with no loss of productivity to account for Lemerande's need to shift positions frequently due to her pain. He also added a limitation for no greater than frequent use of her hands. R. 24.

Lemerande asserts the ALJ "cherrypicked" evidence regarding her mental impairments. Again, both Dr. Pape and Dr. Spear opined that Lemerande's mental impairments were not severe, and Lemerande has not presented any evidence from a treating physician opining as to any limitations caused by these impairments. After reviewing the medical evidence and other evidence in the record, the ALJ found Lemerande has mild limitation in her activities of daily living, social function, and concentration, persistence and pace as well as no episodes of decompensation. R. 20–21. Without any allegations from Lemerande or any medical source that her affective disorder, depression, anxiety, and panic attacks create any limitations or restrictions upon her functional capacity, the ALJ did not err in failing to create limitations of his own. In short, the ALJ properly evaluated the medical evidence, including the opinions of the state agency physicians, in creating the RFC.

Lemerande next asserts the ALJ did not properly evaluate her obesity. SSR 02-1p requires an ALJ to "do an individualized assessment of the impact of obesity on an individual's functioning when deciding whether the impairment is severe." SSR 02-1p, 2002 WL 34686281, at *3. Nevertheless, an ALJ's failure to explicitly consider the effects of obesity may be harmless error if the ALJ demonstrated that he reviewed the medical reports of doctors familiar with the claimant's obesity. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). Although the ALJ did not

expressly mention the effects of Lemerande's obesity at each stage of the five-step evaluation, he found obesity to be one of Lemerande's severe impairments and explained that he considered her obesity and accompanying impairments in accordance with SSR 02-1p. R. 18. No treating or examining physician stated an opinion that Lemerande's obesity limited her ability to work, but the ALJ nevertheless acknowledged that her treating physicians observed that her obesity did contribute to her other physical problems. Lemerande does not cite any evidence she believes the ALJ failed to consider regarding her obesity. As a result, the court concludes the ALJ did not commit reversible error by failing to expressly consider any limitations caused solely by obesity.

Finally, Lemerande asserts the ALJ failed to account for limitations caused by her migraines. Although Lemerande testified that she experienced severe migraines two to three times a month (R. 60), the ALJ found that she had exaggerated her symptoms. The ALJ did not list migraines as one of Lemerande's severe impairments. R. 18. In explaining why he did not find her migraines a severe impairment, the ALJ noted that "the record established a history of sporadic migraines, for which she occasionally went to the emergency room." R. 19. He noted that an August 2011 CT scan of her head showed no abnormalities, and changes in her blood pressure medication had helped reduce her headache frequency. The ALJ noted that Lemerande also saw a neurologist in late 2014 and 2015 for her headaches and reported improvement after he adjusted her medication. Having reasonably concluded from this evidence that her migraines were not a severe impairment, and based on his further finding that Lemerande exaggerated her symptoms, the ALJ did not err in not adding limitations attributed to such impairment. No medical opinions suggested otherwise. For all of these reasons, substantial evidence supports the ALJ's RFC finding.

## CONCLUSION

For the above reasons, the decision of the Commissioner is affirmed. The Clerk is directed to enter judgment accordingly.

Dated this  26th  day of February, 2018.

> s/ William C. Griesbach
> William C. Griesbach, Chief Judge
> United States District Court